## JACK GEIGER v. STATE.

No. A-4202.  Opinion Filed Dec. 29, 1923.

(221 Pac. 122.)

(Syllabus.)

1. **Homicide—Conspirator not Responsible for Acts of Coconspirator in Consummating Different Murder.** If two persons conspire to commit murder and one of them conspires with another to commit a different murder, the one who is involved in the first conspiracy without aiding in the other will not be responsible for the acts of the others in consummating the second.

2. **Evidence—Active Conspirator an "Accomplice" within Corroboration Rule.** An active conspirator in the commssion of a felony is an "accomplice" with the coconspirator who actually

perpetrated the deed, and the testimony of such an accomplice must be corroborated by other evidence as to the commission of the offense and the persons involved.

Appeal from District Court, Kiowa County; Thos. A. Edwards, Judge.

Jack Geiger was convicted of murder, and he appeals. Reversed and remanded.

Thos. W. Conner and Rummons & Hughes, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Jack Geiger, plaintiff in error, herein referred to as the defendant, was on the 24th day of April, 1921, in the district court of Kiowa county, convicted of the murder of William G. Hester on March 10, 1921. Defendant was sentenced to imprisonment for life in the state penitentiary at McAlester. From the judgment of the court below he appeals to this court.

It appears that Ernest White killed Hester while the latter was plowing in a field near his home, and this conviction rests upon evidence tending to show that this murder was committed pursuant to a conspiracy with Geiger, the defendant, and that the latter was the real instigator of the crime.

Frequently we are called upon to decide homicide cases growing out of what is commonly called "the eternal triangle." In this case there were two triangles, each intersecting the other, involving the moral depravity and conflicting agreements of three conspirators, making it exceedingly difficult to make a lucid statement of fact. Preliminary to stating the facts in narrative form, the following outline may be

set out in order that the state's theory of the case and the narrative following may be better understood:

First. Hester, the deceased, had interfered with the domestic affairs of Rufe Boyett.

Second. Geiger, the defendant, maintained adulterous relations with the wife of Ernest White.

Third. White killed Hester, against whom he had no grievance, pursuant to an agreement that Boyett should kill Geiger, here charged as an accomplice in the killing of Hester), who had broken up White's home.

Fourth. Geiger, the defendant, had an agreement with Boyett that the latter should kill White, in order that Geiger might have White's wife, somewhat as in the biblical story of David and Uriah.

Boyett, the chief witness for the state, participated in both conspiracies (if there were two), without any intention of doing any overt act towards carrying either into actual execution. In other words, Boyett intended to double-cross his coconspirators in both of these interlocking conspiracies. In several particulars there was no concert of action or meeting of the minds as between Geiger and White, who actually committed the murder.

Condensing the story and omitting sordid details, in which the record abounds, there are two theories presented by the evidence: First, a conspiracy between White and Boyett for White to kill Hester and in return for his so doing Boyett was to kill Geiger. Boyett testifies to this conspiracy. The other conspiracy referred to in Boyett's testimony, and somewhat intermingled with the first, is that Geiger suggested to Boyett that Hester be killed and that he (Geiger) would make arrangements to have Hester killed

provided Boyett would kill White.  It appears in the record that Geiger knew that Hester had, before the suggestion was made, broken up the home of Boyett, and he had reasons therefore to believe that Boyett would be agreeable to a conspiracy one of the purposes of which was to get rid of Hester.  Also there is ample evidence in the record to substantiate Boyett's story that Geiger desired at the same time to get rid of White, and there is some testimony by Boyett, but not corroborated, to the effect that Geiger also desired to get rid of Hester.

If the latter theory, that is, conspiracy No. 2, upon which this conviction must stand or fall, be true, in order to connect Geiger with the killing of Hester, as a coconspirator, it was necessary for the state to connect him by some overt act or by some declaration in furtherance of the conspiracy to kill White.  In our opinion the mere showing of animosity between Geiger and White was not a sufficient corroboration in this case.  Hester was killed by White and White had the same motive for the killing of Geiger that Boyett had for the killing of Hester.  Geiger had broken up the home of White and White's domestic troubles were known to Boyett and Boyett's domestic troubles were known to White.

There is evidence by the witness Ed Nail, a negro, that Geiger on one occasion made an unsuccessful attempt to kill White, and there is also evidence, uncontradicted, that Mrs. White and Geiger sustained adulterous relations with each other.  But is this sufficient evidence to corroborate the testimony of Boyett as to this intricate conspiracy?  We believe not.  The effort that Geiger made to kill White occurred long before it is contended there existed any conspiracy between Boyett and Geiger to kill White and Hester, and Geiger's effort in that respect was entirely unknown to Boyett and not a part of any plan between them.  The adulterous relations

between Mrs. White and Geiger would furnish a motive on the part of either Geiger or White to want to get rid of the other. Such evidence is just as consistent with the theory that the killing of Hester was the result of a conspiracy between White and Boyett to do away with Geiger and Hester, if not more so, than that it was the result of the alleged conspiracy between Boyett and Geiger, through White, to kill Hester and then Boyett kill White.

According to Boyett's testimony, the first arrangement he had with Geiger was that Geiger wanted him (Boyett) to make White mad and try to get White to meet him (Boyett) in the road some place, or on Teepee Mountain or Teepee Creek so that Geiger could get a chance to "bump off" White. This was on the 14th of February, 1921. Boyett then says that the next time he saw Geiger was on the 17th of February, which was the day Boyett moved away from Hester's place to Harris' place and after he had so moved. In that conversation he says that Geiger asked him if he had seen White, and that he told Geiger that he had seen White that morning; Geiger asked if White had anything to say about him (Geiger), and Boyett told him he did not, only he wanted Boyett to get Geiger off where he could get him. Then Geiger wanted to know when White was coming back, and Boyett told him he did not know, and Geiger said:

"The next time you go over there, make it a point to see him and get him off over here on the mountain or on the creek."

Further, Geiger said for Boyett to sit steady in the boat and he would get his folks back and it would not be long. Boyett says that Geiger further said that he would get Hester out of Boyett's way and out of Boyett's family and he would bump Hester off or get it done.

Boyett further testified that Geiger said that Hester had beaten him out of $1,500 when he (Geiger) was in the penitentiary, and that Hester then owed him between $500 and $600 that Geiger had loaned him, and that he could not get it, and that he (Geiger) wanted Hester out of there so that he could get a mortgage on his wheat crop and get his money; that Geiger suggested that he was either going to kill Hester or get him killed, and that he could get White to do it if he could not get a chance to do it himself.

Boyett said further that on the 4th of March, 1921, Boyett went with Geiger to Anadarko in Geiger's Ford car, and that the purpose of this trip was that Geiger wanted to assign a lease to him so that he (Geiger) would not lose his wheat crop. This was an Indian lease. That on that trip the killing of Hester was discussed, and Geiger again told Boyett to sit steady in the boat; that he would get "shed" of Hester; that he could get rid of him for a bad debt that he had out in the sum of $300, and that he would never collect it anyway; that White owed him $300, and that he would never collect it in money anyway; that he told Boyett to keep that under his hat or there would be another liable to get "bumped off." Boyett testifies that on the morning of February 17th, in pursuance of the arrangement proposed by Mr. Geiger, the following occurred between Mr. White and himself:

"I met White right in front of Mr. McGhee's house, something like a couple or three hundred yards from the house. He asked me if I was moving, and I told him I was. I told him they had got so intimate I didn't feel like I could stay there without trouble, and I didn't want to have it so I moved. 'Well,' he says, 'a man that will do that ought to be killed; there's one over here, Jack Geiger, has tore up my home just like Hester has yours.' Then he says: 'You get one and I'll get the other. You get Geiger and I'll get Hes-

ter. I told him I didn't want to get into any trouble and didn't want any one else to get into trouble over my troubles. I started to drive on—drove something like the length of this house. He hollered and stopped me. He says: 'Are you going to do it? Tell me yes or no.' I just says, 'Yes,' and started my team. He says, 'Well, now, stick to it.' "

The witness Aubray Howell testified that after the killing he had a conversation with Geiger in which Geiger told him that Rufe Boyett was to shoot him and Ernest White was to shoot Hester, and that Geiger also told the witness about Ernest trying to get him (Geiger) off down to Saddle Back Mountain, and that Geiger said that Ernest said there was some negroes down there that had some whisky and Ernest was going to take Geiger with him to run the negroes off, and he would get the whisky and get the pay the negroes owed him. On cross-examination this witness stated that the conversation occurred shortly after Hester's death and that nobody else was present except the witness and Geiger; that he and Geiger had been good friends. Further, when asked if Geiger did not express his opinion that the killing was a frame-up between White and Boyett, the witness replied, "I don't know whether he meant it that way, but he told me that was the way it was to go." On further cross-examination as to what he had testified at the preliminary trial, he was asked if he did not make the following answer in reply to a question as to what Geiger had said to him after the killing:

"That's all he said. He just told me about the frame-up, that Rufe Boyett—that Ernest was to kill Mr. Hester and Mr. Boyett was to kill him."

He said he did not recollect just what he had said at that time.

A homicide committed pursuant to either of the conspiracies alleged to have existed involves Boyett as an "ac-

complice,'' and his testimony must therefore be corroborated. After a most painstaking consideration of the entire record, we conclude that there is not sufficient corroboration of Boyett's story to sustain the state's theory that Geiger was an accomplice of White in the murder of Hester. In our opinion there is nothing more than a far-fetched suspicion that such was the case.

The judgment of the trial court is therefore reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

MATSON, P. J., and DOYLE, J., concur.